**EXHIBIT A**

State of Illinois        )
                         ) ss
County of St. Clair      )

**UNSWORN DECLARATION UNDER PENALTY OF PERJURY
IN SUPPORT OF COMPLAINT FOR FORFEITURE**

I, Bradley Blake, declare under penalty of perjury the following:

At all relevant times, I have been a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA). The contents of this Declaration are based on information provided to me during the course of my investigation from participants in the criminal activity, from other witnesses, and from other law enforcement officers.

1.  On December 13, 2019, declarant and TFO Larry Brantley (TFO Brantley) conducted a traffic stop on a white/tan Tiffin Phaeton Motorhome recreational vehicle (RV) bearing a Washington registration for improper lane usage on Interstate 70 west bound near the 21 mile marker located in Madison County, Illinois. The RV returned to Jay A. LAES, of Kelso, Washington.

2.  Declarant approached the passenger side of the RV to make contact with the driver. The driver identified himself as the registered owner, Jay A. LAES. Declarant could see inside the RV and saw a passenger, later identified as Jacqueline R. LAES.

3.  After initial contact was made with Jay LAES, declarant informed Jay LAES the reason for the traffic stop and requested his driver's license. Declarant asked Jay LAES if he could step out of the RV to talk about the traffic stop at the patrol vehicle. Jay LAES exited the RV and provided his information to declarant.

4.  While TFO Brantley spoke with Jay LAES in the patrol vehicle, declarant returned to the RV to speak with the passenger, Jacqueline LAES.

5. TFO Brantley queried Jay LAES' information in law enforcement databases during their consensual conversation. Jay LAES told TFO Brantley that he and his wife were traveling back home to Washington ahead of the impending bad weather coming to the area. TFO Brantley asked where they were traveling home from and Jay LAES stated, Mansfield, Ohio. Jay LAES stated that his wife has family there and they had traveled there to visit them. TFO Brantley asked Jay LAES how long they visited his wife's family for and he responded, "a week and a half." TFO Brantley asked Jay LAES that question specifically because license plate readers (LPR) showed the RV in Amaril1o, Texas on December 8, 2019. TFO Brantley repeated Jay LAES statement about visiting family for a week and a half and Jay LAES did not correct TFO Brantley, but made comments to help validate it.

6. TFO Brantley also spoke to Jay LAES about his employment status. Jay LAES said he is a carpenter who is non-union and works for himself. During this conversation with Jay LAES, Jay LAES made very little eye contact with TFO Brantley as they spoke. Jay LAES watched declarant speaking with Jacqueline LAES with an uneasy look on his face. Jay LAES also showed signs of having a dry mouth and would swallow frequently. When Jay LAES was not staring towards the RV he was moving around in a fidgety way as if he was uncomfortable. While viewing what TFO Brantley believed to be nervous behavior from Jay LAES, TFO Brantley queried Jay LAES's criminal drug history. TFO Brantley found that Jay LAES has a previous conviction for Manufacturing Marijuana and Delivery/Manufacturing/Marihuana in 1996.

7. While TFO Brantley was speaking with Jay LAES, declarant spoke with Jacqueline LAES at the passenger side of the RV. Jacqueline LAES told declarant that she and Jay LAES traveled to Columbus, Ohio to visit her sister. Jacqueline LAES said they were only

there for a few days and were trying to hurry up and get home before the bad weather. Jacqueline LAES told declarant they drove straight to Columbus, Ohio from Kelso, Washington without making any detours or stops for sightseeing. Jacqueline LAES said they had gone to the Rock & Roll Hall of Fame in Cleveland, Ohio, while they visited but did not go anywhere else.

8. After declarant concluded his conversation with Jacqueline LAES, he returned to the patrol vehicle. TFO Brantley informed Jay LAES that he cou1d return to the RV and that his driver's 1icense would be returned at the completion of the traffic stop. TFO Brantley and declarant informed each other of the conversations with Jay LAES and Jacqueline LAES. When declarant and TFO Brantley combined the criminal history of Jay LAES, his nervousness, the unusual travel routes, and the inconsistencies in their travel timelines, TFOs believed Jay LAES and Jacqueline LAES had revealed multiple signs which led the officers to believe the LAES' were involved in criminal behavior.

9. TFOs also noted that neither Jay LAES, nor Jacqueline LAES, had an explanation as to why they might have been so far off route and in Amarillo, Texas only five days before the stop. TFO Brantley requested assistance from TFO Kyle Waddington and K-9 handler TFO Jake Degener.

10. Before TFO Waddington and TFO Degener arrived on scene, declarant re-approached the RV and spoke with Jay LAES as he returned Jay LAES identification and concluded the traffic stop. Declarant continued speaking with Jay LAES and asked if there was anything illegal inside the RV. Jay LAES said "no." Declarant asked Jay LAES if there was any marihuana, cocaine, methamphetamine, heroin, or any large amounts of United States currency inside the RV and Jay LAES responded no to all. Declarant asked Jay LAES if the TFOs could search his RV. Jay LAES said, "I'm an American, a staunch conservative and I don't understand

3

why you would want to search my RV." Declarant explained to Jay LAES that people use RVs to traffic drugs across the country and the TFOs wanted to see if they were involved. Declarant told Jay LAES he had the right to refuse consent to search. Jay LAES began asking declarant, "What happens then?" Declarant told Jay LAES that he and Jacqueline LAES would be free to leave, but the RV would be detained momentarily for a K-9 to conduct an open-air sniff of the RV for narcotics. Jay LAES asked again, "What happens then?" Declarant told Jay LAES that if the K-9 gave a positive alert for the presence of narcotics on the RV, that officers would perform a probable cause search of the vehicle. Jay LAES groaned and said, "Well then come on in!"

11. Declarant confirmed with Jay LAES that the TFOs could search his RV and Jay LAES confirmed by saying, "Yes." Declarant told Jay LAES to grab any jackets, shoes, or whatever he and Jacqueline LAES may need and to wait outside. Jay LAES and Jacqueline LAES exited the RV and stood on the shoulder with their dog while the TFOs conducted a consent search of the RV.

12. TFO Brantley along with TFO Waddington and TFO Degener began a consent search of the RV. Soon after they began searching, TFO Waddington located a black New Era hat box. Inside the hat box TFO Waddington located a rubber-banded bundle of United States currency, a vacuum sealed bag containing a glass pipe, a lighter, and a clear baggie of suspected marihuana.

13. TFO Waddington moved the hat box from its location above the rear bedroom cabinet and located a clear baggie containing multiple packets of cannabis-infused strawberry chocolates. TFO Waddington informed the other TFOs of the items he found and it was decided to take the RV to a safer location to conduct a more thorough search. The TFOs left the contents

of the RV as they were and exited to inform Jay LAES and Jacqueline LAES that the consent search of the RV was now a probable cause search.

14. TFO Brantley told Jay LAES and Jacqueline LAES that they would now be detained with their vehicle until the TFOs could complete the search. TFO Brantley further informed Jay LAES and Jacqueline LAES that the RV would be transported about 15 minutes from the current location to the Pontoon Beach Police Department (PBPD) in order to conduct a safer and more thorough search. TFOs believed that after a more thorough search was completed they would uncover evidence demonstrating that Jay LAES and Jacqueline LAES had been involved in drug trafficking. TFO Brantley and declarant did not formally arrest Jay LAES and Jacqueline LAES roadside due to their cooperation and they did not appear to pose a threat.

15. TFO Degener transported the RV, while TFO Brantley and declarant transported Jacqueline LAES and her dog, and TFO Waddington transported Jay LAES. Upon arrival at the PBPD, TFO Degener parked the RV on the parking lot and Jay LAES and Jacqueline LAES were both allowed to freely walk around outside or to wait inside the PBPD.

16. While TFO Brantley and declarant transported Jacqueline LAES to the PBPD, the three spoke in the car. Jacqueline LAES was visibly shaken and seemed afraid of Jay LAES. She would begin to cry at times and her eyes were filled with tears when she spoke about her trip. At one point during the conversation, Jacqueline LAES broke down and said, "He (Jay LAES) told me to say we only went to Ohio." When asked about the hidden United States currency she said, it would either be in a suitcase or a backpack.

17. As the TFOs began searching the RV at the PBPD, TFO Brantley opened the storage compartments underneath the RV and saw a gray and black suitcase inside the front driver's side compartment. TFO Brantley unzipped the suitcase and located a paper bag labeled

5

"Crossroads Factory Store." Inside the bag were multiple bundles of rubber-banded United States currency.   TFO Brantley continued checking the underneath storage compartments of the RV for the possibility of locating a hidden compartment or trap. While removing items to view the floor, TFO Brantley could smell the odor of sealant or glue. TFO Brantley then found several tubes of caulk and Gorilla Glue. Some of the tubes have been used and some were brand new. TFO Brantley then noticed a large square compartment located in the center of the RV, underneath the sitting or living room area of the RV. TFO Brantley observed the carpeting around the compartment was folded at the corners and did not appear to be professionally done. TFO Brantley knocked on the exterior of the compartment and it sounded like knocking on sheet metal. TFO Brantley began prying on the exterior of the compartment in an attempt to gain access to its interior. TFO Brantley removed a portion of the carpeting and noticed there was a base of plywood, wrapped with sheet metal that had carpeting glued to it. TFO Brantley believed this was a hidden compartment to conceal contraband and was of the kind typically found and used with trafficking narcotics with RVs.

18.   As TFO Brantley concluded that the RV contained a hidden compartment believed to conceal contraband, he asked TFO Degener to deploy his K-9 Blu in the RV to try and pinpoint an area where narcotics may have been stored or an access point to the hidden compartment. Shortly after TFO Degener deployed K-9 Blu he observed K-9 Blu focus on certain areas inside the RV. One location was the center of the floor in the living room, directly over the hidden compartment. The other location K-9 Blu continued to alert to was the inside of a lower cabinet in the kitchen area. TFO Degener opened the cabinet but did not observe anything inside it. TFO Degener then reached to the rear corner of the cabinet, pulled down a

piece of paneling, and located a vacuum-sealed bundle of United States currency hidden behind it.

19. After failing to locate an access point for the hidden compartment from underneath the RV, it was decided the entry point to the compartment had to be on the inside of the RV. TFO Brantley entered the RV and began removing flooring from the living room. The TFOs checked the subfloor and noticed part of the subfloor was not properly screwed down and secured. The TFOs were able to raise a portion of the plywood subfloor and located the access point to the hidden compartment.

20. The hidden compartment did not have any contraband inside of it. Due to the RV containing a hidden compartment and its potential use for trafficking narcotics a decision was made to seize the RV. The TFOs completed their search of the RV and then emptied the RV of all of Jay LAES and Jacqueline LAES' personal items. The TFOs removed the items, bagged the items and secured them next to the RV. The RV was then secured on the parking lot of the PBPD where it was under constant video surveillance.[1]

21. As the RV was being processed, Group Supervisor Rob Eisenbarger (GS Eisenbarger) arrived at the PBPD to assist with the interviews of Jay LAES and Jacqueline LAES. GS Eisenbarger and declarant conducted separate audio/video recorded interviews of Jay LAES and Jacqueline LAES. Jay LAES and Jacqueline LAES were both read their Miranda Rights and they both waived their rights and agreed to speak with GS Eisenbarger and declarant.

22. GS Eisenbarger and declarant interviewed Jacqueline LAES first. GS

---

1 On December 14, 2019, TFOs Degener and Waddington returned to the PBPD and transported the RV to a secure parking lot controlled by the Monroe County Sheriff's Office. The United States Marshals Service (USMS) was notified of the location of the RV.

7

Eisenbarger asked Jacqueline LAES where they were headed when they were stopped. Jacqueline LAES stated that they were headed back home to Washington, but may go to San Diego, California. She stated they were coming from Columbus, Ohio. She stated they had been there for a few days and they were visiting her sister, "Sheila Davis", who lives in Lexington, Ohio.

23. GS Eisenbarger asked Jacqueline LAES if they went to New York and she said they had gone to Niagara Falls. She stated they went to Niagara Falls after they went to visit her sister and they did not visit her sister again after they left Niagara Falls, but were traveling back through the same area. Investigators asked Jacqueline LAES when she and her husband had left Washington and she said two weeks ago.

24. GS Eisenbarger advised Jacqueline LAES that that officers found several vacuum-sealed bags of United States Currency, which were located hidden within the vehicle and that an aftermarket hidden compartment was also located. GS Eisenbarger asked if they had completed any recent work to the RV and Jacqueline LAES stated they had a new floor put in because when they purchased the RV, the floor was bad and a new floor was part of the deal when buying it. Jacqueline LAES stated that they purchased the RV in San Diego, California. She said her husband, Jay, travelled to San Diego to purchase the RV and he purchased the vehicle from a person who sells RVs on the side. Jacqueline LAES said she thought they paid $37,000.00 for the RV. Jacqueline further said that Jay LAES paid for the RV with a cashier's check and that her husband's boss bought it and they have been buying it from him. Jacqueline LAES stated that her husband's boss's name is "Oak." She stated "Oak" is in the film industry and owns "Crescent Films." Jacqueline said that she did not know "Oak's" last name.

25. GS Eisenbarger reminded Jacqueline LAES what had been found so far and said that it was odd that a person she only knows by a first name helped them purchase a $37,000.00 vehicle. GS Eisenbarger told Jacqueline LAES that it appeared to investigators that she and her husband were likely transporting some type of illegal drug across the country.

26. Jacqueline LAES continued that her husband hides money from her all the time. She further stated that once they arrived at the Pontoon Beach Police Department, Jay LAES told her that he had money in the RV and that he had planned to purchase her a car and a trailer to haul it back home. She said that he said it was going to be a Christmas gift and they were going to tow it home. She said Jay LAES further told her that was the reason why they went to Niagara Falls, to look at a car, however Jacqueline LAES told officers that she knew nothing about those plans until they arrived at the police station.

27. GS Eisenbarger asked Jacqueline LAES why not just put the money into a bank account and write a check for the vehicle instead of transporting it in heat-sealed bags. She stated it is kind of weird, but stated that she once accrued $40,000.00 in credit card debt, so now her husband takes the money he makes and hides it from her. GS Eisenbarger asked Jacqueline LAES if Jay LAES said how much money he brought with him and she said he told her it was about $26,000.00.

28. Investigators asked Jacqueline LAES if she ever saw the car Jay LAES was attempting to buy for her and she said she did not. She said he was gone from her for approximately 30 minutes to look at the vehicle. She again said she did not know about the car until they arrived at police station.

29. Jacqueline LAES stated she had a nervous breakdown two years ago. She said her son was suicidal and would disappear for long periods of time. She stated he was in the military.

30. GS Eisenbarger asked Jacqueline LAES why Jay LAES would hide the money back behind a cabinet and she said so that she could not find it. GS Eisenbarger asked her why a police K-9 would alert on that money and she said she did not know. GS Eisenbarger asked Jacqueline LAES if she had ever known her husband to be involved in the drug trade and she said no.

31. Investigators asked Jacqueline LAES about the hidden compartment in the floor and she said she did not know it was there.

32. Investigators asked Jacqueline LAES if they had traveled out East in this RV before and she said they came out in it to see her sister once before. She stated this trip was not long after they got the RV, approximately three weeks. She stated on that trip they also went to Tennessee to visit Dollywood and the Grand Ole Opry.

33. Jacqueline LAES, when asked by investigators, stated she has never known her husband to be involved in the drug trade but he does smoke marijuana. She stated the most she has ever seen him with is probably 1/8th.

34. GS Eisenbarger asked Jacqueline LAEES if she knows "Oak" to be in the drug business and she said she does not know him very well, she just knows that her husband works for him occasionally.

35. Jacqueline LAES stated she would be very surprised if her husband was involved in the drug trade, but admitted that it all does seem suspicious.

36. GS Eisenbarger asked Jacqueline LAES if she and Jay LAES had any checking or savings accounts together and she said no. She said when she had her nervous breakdown, her identity was stolen and their accounts were closed. She stated neither of them have bank accounts and she does not know if her husband files taxes.

37. Jacqueline LAES stated that their house is paid for and that her husband, Jay LAES, received an inheritance from his grandparents having "water shares." She said the inheritance was approximately $90,000.

38. GS Eisenbarger asked for consent to look at Jacqueline's cellular phone and she agreed. GS Eisenbarger located a message which said "Arrested? Lawyer needed?" Jacqueline LAES stated she did not get that message and GS Eisenbarger stated that the message just came in. Jacqueline LAES said she did not know who the message was from or what it is about. GS Eisenbarger showed the message to Jacqueline LAES and she stated "Oh, Jay used my phone."

39. GS Eisenbarger and declarant then interviewed Jay LAES. GS Eisenbarger asked Jay LAES where they were traveling to currently and he stated home, and possibly to San Diego to pick up his wife's brother. He stated they were taking a southern route because it was warm. GS Eisenbarger asked where they had been and Jay LAES stated they had been out visiting his wife's sister, which investigators knew to be the Lexington/Mansfield, Ohio area. Jay LAES stated they stayed in the motorhome last night in Effingham, Illinois. Jay LAES further stated they had visited Cleveland, Ohio and the Niagara Falls area.

40. GS Eisenbarger asked Jay LAES if he had any other business while traveling and Jay LAES stated that he was going to try to buy a car. Jay LAES stated the car was one that his brother-in-law found but after he and his brother-in-law went to look at it he did not purchase it. Jay LAES stated that the car was not what it was reported to be and that it was not good enough for the price they wanted, which was approximately $8,000. Jay LAES further stated that they saw the car in Lexington, Ohio. Jay LAES stated Jacqueline LAES did not know about the vehicle and further explained that she had a nervous breakdown approximately two years ago and since then he does not allow her access to their money.

41. GS Eisenbarger inquired about the LAES' itinerary for their trip. Jay LAES stated they went from Kelso, Washington, where they live, to Mansfield, Ohio. He stated they stayed one night in Mansfield and then they, along with his brother- and sister-in-law, traveled to Niagara Falls, Cleveland, Ohio, and then back to Mansfield, Ohio. Jay LAES stated they looked at the car when they first got to Mansfield, not on the return trip. Jay LAES said if they would have purchased the car he would have had to also purchase a trailer haul it to back on. Jay LAES further stated that Jacqueline LAES did not know he was going to look at a car and did not know that he had the money. He said he only told her just a little bit ago after TFOs found the money.

42. GS Eisenbarger asked Jay LAES how long he has owned the RV. He told investigators that he has had it since June or July and that he purchased the RV in San Diego, CA. Jay LAES stated he did not remember who he bought it from but it was a person who had two. He said he flew to San Diego to get it. Jay LAES told investigators that he purchased the RV for $30,000. He said he personally paid $7,000 and that he got a loan/cashier's check from his parents for the remaining $23,000. Jay LAES stated the $7,000.00 he paid was in the form of a check from his Bank of America account.

43. Jay LAES then stated that he did not understand and that this was getting to be way too much, that he only had two grams of weed on him. GS Eisenbarger explained that he also had several thousand dollars hidden away that a trained K-9 alerted on, as well as an aftermarket hidden compartment that drug agents know is used to transport narcotics. Jay LAES replied that there were no narcotics in there.

44. GS Eisenbarger asked Jay LAES to explain why the money was the way it was. Jay LAES stated because he has to keep it hidden from his wife. GS Eisenbarger noted that it was vacuum-sealed and Jay LAES said yes and that he had it hidden in a little cubbyhole and

that he had travel money in his suitcase. Jay LAES told investigators that he put the money in the cubbyhole the day before they left on their trip.

45. Investigators asked Jay LAES about a man named, "Oak," who Jacqueline LAES stated during her interview loaned Jay LAES the money to purchase the motorhome. Jay LAES stated Oak was Oak FORTELLI and that he was just a client who he does carpentry work for.

46. Investigators asked Jay LAES if he had ever been arrested. He stated that he had been arrested for having one "weed" plant in his closet years ago.

47. GS Eisenbarger asked Jay LAES what he does for money when he is taking these trips and Jay LAES stated he has been saving his money for two years and that he works six or seven days a week. GS Eisenbarger asked Jay LAES if he files taxes and he stated he does, but not as much he is supposed to. He further stated he claims pretty much nothing. He stated he thinks he claimed approximately $2,000 to $2,500 this past year.

48. Jay LAES stated he owns his house and has owned it for 17 years. He said his grandparents had water rights to the "Puta River." He stated he was part of a trust and received money from it. He stated he received $280,000 from this trust and paid $47,000 in taxes. He stated he bought a house, a car, and opened a music education business with the money. He said his music education business made a profit one month out of ten years and eventually had to close the store. Jay LAES stated the name of his business was East to West Studios or E2W.

49. GS Eisenbarger asked Jay LAES about the "cubby hole," referring to the hidden compartment. He stated it was all open underneath the motorhome and Investigators told him that it was, except for a large compartment built down, which appears new. Jay LAES stated it was like that when he got it and that he did not have it put in.

50. GS Eisenbarger asked Jay LAES if the motorhome is paid for and LAES stated it was. He stated he does a lot of work for his parents.

51. GS Eisenbarger showed Jay LAES a phone number he had written down and asked if he knew whose number it was. The number had sent a message to Jacqueline LAES' phone during her interview that stated "Arrested? Need a lawyer?" Jay LAES stated he did not know the number. He was asked if he was using his wife's phone while they were in the PBPD lobby and he said no. Jay LAES was asked if investigators went back and looked at the surveillance cameras, would Jay LAES been seen using Jacqueline LAES' phone and he said "I don't think so."

52. GS Eisenbarger asked Jay LAES if he knew anything about the compartment or if his fingerprints would be down inside of it. Jay LAES stated he did not know anything about the compartment and that they would not find his fingerprints inside of it. GS Eisenbarger asked Jay LAES why he kept the money vacuum-sealed. Jay LAES stated because he had a vacuum sealer and it keeps the money safe, where he can hide it from his wife.

53. GS Eisenbarger asked Jay LAES how many trips they had taken in their motorhome. Jay LAES stated that this is their second trip. He stated the first trip was from Kelso to San Diego, approximately 3 months ago, and that they did not go anywhere else. Declarant asked if they came out this way on the previous trip and Jay LAES stated they did not. GS Eisenbarger asked again if they traveled to Ohio on their previous motorhome trip and Jay LAES stated they did not.

54. Declarant noted that during this trip, Jay LAES' motorhome was spotted in Amarillo, Texas by License Plate Readers (LPR) on December 8, 2019. GS Eisenbarger asked

Jay LAES why they went that way if they were going to Ohio. He stated because of the weather. Jay LAES stated it added a day and a half of travel.

55. Because Jay LAES previously stated they had made no prior trips in the motorhome to Ohio, or to this part of the country, declarant exited the interview and retrieved a receipt that was located during the search of the motorhome. The receipt was from McDonald's in Caseyville, Illinois dated September 21, 2019. Declarant returned to the interview and presented the receipt to Jay LAES. Jay LAES was told that the receipt was found in the RV during the search. Jay LAES stated that the receipt did not look familiar to him. He further stated he did not think he had ever been in Caseyville or on Interstate 64. While looking at the receipt, Jay LAES stated "sadly, I do eat sausage mcmuffins," which was on the receipt. GS Eisenbarger asked if there was a chance he had been through here and did not remember it and Jay LAES said "I don't think so."

56. GS Eisenbarger asked Jay LAES if he could look in his work phone and Jay LAES handed the phone over and gave consent for GS Eisenbarger to look at it. GS Eisenbarger located a text message conversation and asked Jay LAES if he went to North Carolina in November. He said no. GS Eisenbarger asked Jay LAES who "Ash" is and he stated it's a girl. GS Eisenbarger verbally summarized the text message conversation he found and said there is a conversation about driving the RV and she gave you an address and you asked if we were "going to unload in the same spot as before behind the house, that's kind of in the open, can't we find a better spot than that?" GS Eisenbarger stated there appeared to be several people in the text message conversation and Jay LAES stated maybe it was the other people having the conversation and he wasn't involved. Declarant viewed the text conversation as well and it appeared to investigators to be the owner of the device responding to messages. GS Eisenbarger

15

continued to read the conversation aloud, which appeared to be making arrangements for a delivery of some nature. Jay LAES denied knowledge or involvement in the conversation.

57. GS Eisenbarger located photographs on Jay LAES phone of the new floor and hidden compartment in the motorhome. GS Eisenbarger told Jay LAES he thought LAES said the floor was already done when he got the RV, but there were pictures on the phone of the work being done on the floor. Jay LAES stated "not me, the floor was done when I got it." GS Eisenbarger stated there are pictures of the process of the floor being done. Jay LAES stated he thought they came from "Mo," from whom he bought the motorhome, and he does not remember what Mo's full name is.

58. On December 18, 2019, TFO Degener arrived at the FHRO to conduct a K-9 sniff of the United States currency with his K-9 Blu. The United States currency was removed from the temporary safe and placed into a brown paper bag. A paper bag line up was set up in the back room of the Fairview Heights DEA Office. TFO Degener set K-9 Blu up at the first bag on the right side and allowed K-9 Blu to get acclimated with the environment. TFO Degener gave K-9 Blu a command to search for narcotics. TFO Degener observed K-9 Blu sniff by the first two bags and upon approaching the third bag observed K-9 Blu sniff the bag. TFO Degener observed K-9 Blu's breathing change slightly and the K-9 Blu backed up and sat down next to the bag. TFO Degener informed declarant that K-9 Blu gave a positive indication on the third bag for the odor of narcotics. Declarant informed TFO Degener that the third bag contained the United States currency that was seized from the RV.

59. On December 18, 2019, following the K-9 sniff, TFO Degener and TFO

Waddington transported the two packages of seized currency to Loomis for an official count. The United States currency was determined to be $14,790.00. The second package was determined to be $11,910.00.

60. Based on the foregoing, declarant believes that the 2004 Tiffin Phaeton RV, bearing VIN: 4UZAAHAK24CM37627, with all accessories, attachments and components thereon, constitutes a conveyance which was used or intended to be used, to transport, or in any manner to facilitate the transportation, sale, receipt, possession or concealment of a controlled substance, and is thus subject to forfeiture to the United States pursuant to 21 U.S.C. ' 881(a)(4).

61. Declarant further believes that based on the foregoing, the subject-matter $14,790.00 in United States Currency is property which constitutes money furnished or intended to be furnished by a person in exchange for a controlled substance, or proceeds traceable to such an exchange, or money used to facilitate a violation of 21 U.S.C. ' 801 *et seq*.

62. Declarant further believes that based on the foregoing, the subject-matter $11,910.00 in United States Currency is property which constitutes money furnished or intended to be furnished by a person in exchange for a controlled substance, or proceeds traceable to such an exchange, or money used to facilitate a violation of 21 U.S.C. ' 801 et seq.

Pursuant to 28 U.S.C. ' 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 2nd day of June, 2020.

TFO *[signature]*
BRADLEY BLAKE
Task Force Officer
Drug Enforcement Administration